15-1905 Merck Sharp & Dohme Corp. v. Xellia Pharmaceuticals May it please the Court, Good morning, Bill Zimmerman of Kenobi Martins on behalf of Xellia. The District Court erred as a matter of law by construing the acetate buffer limitation to encompass subject matter that the applicants disparaged and relinquished throughout the specification and during prosecution, including the tartrate buffered formulations that are disclosed in the patent. And I'd like to begin with the prosecution history. But can we just begin, I mean, what is your view of what standard you need? Do you agree that the claim language is broad and does not limit acetate buffer in the way that you would like us to construe it? The claim language, when read in the context of the patent specification and the prosecution history, can't be given such a broad reading as to encompass acetate buffer that solely comes from the dissociation of the active ingredient caspofungin diacetate. But to get, how would the parties have drafted the claim language to get them where you want to go? They would have had to include the words separately added by, right? Or something akin to that. And they did not do that. They did not do that. And if you read the claim language acetate buffer in a vacuum, you could take a broad enough reading to cover that. But when you read it in the context of this specification and the way it's used, it's clear that they're talking about an added acetate buffer or a separate acetate buffer, not diacetate coming from the active pharmaceutical ingredient caspofungin diacetate. And the specification only contains two types of formulations. Caspofungin diacetate with an added tartrate buffer. And caspofungin diacetate with an added acetate buffer. The specification focuses on what the added buffer is. The briefs from Merck make it sound like the tartrate buffer is described in the specification or the prosecution history as a mixed buffer, as an acetate and tartrate buffer. There is not a single statement in the patent specification or in the prosecution history anywhere. What about the claim? The claim language says acetate buffer. And the question becomes, is that covered? Does it say an acetate buffer that's added separately? No. But if you look at the prosecution history, JA3886, you have the interview summary where the examiner says they showed unexpected results that acetate is a member of a genus and tartrate would destabilize. So what was the examiner comparing? The examiner tells us in the reasons for allowance, JA3889, the specification shows that tartrate buffer unexpectedly destabilizes the claimed peptides while acetate has an unforeseen stabilizing effect. So he's comparing the tartrate examples in the specification to the acetate examples, the added buffer, added acetate versus added tartrate. And he says, you've shown unexpected results for one over the other. It can't be that you then get a claim that encompasses both when you show one has unexpected results compared to the other. And the specification confirms this. It says at JA19, this is column two, lines 23 through 30, the formulations of the invention provide enhanced chemical stability to the pharmaceutical compositions. It's not saying some stability. It's enhanced stability. Enhanced stability. Sorry, where were you reading? It's lines 23 through 30 of column two. The formulations of the invention provide enhanced chemical stability to the pharmaceutical compositions. So it's enhanced. Enhanced compared to what? If you read two sentences later, prior formulations employing a tartrate buffer contain pharmaceutically significant amounts of unwanted degradation products. So we have to have enhanced stability relative to the tartrate examples. And those tartrate examples, by Merck's own concession, contain both acetate and tartrate. And then the next sentence says the use of an acetate buffered formulation results in the generation of fewer degradates and a more stable formulation. Exactly. It means the acetate buffered formulation is not the tartrate buffered one. So you've got to use acetate buffers. You have to use an added acetate buffer or a separate one. But your friend tells us that just disparaging some alternative doesn't necessarily get you there and that you need a clear and unmistakable disclaimer. The specification in this case has repeated statements. And you have the prosecution history where the examiner allowed the claim based on a comparison of the tartrate and the acetate example. If you look at, it spans column two and into column three. At line 66 through 68 of column two, the patent's talking about the tartrate buffered formulation. Now, this is the one that Merck is telling us supposedly has a mixture of tartrate and acetate. It goes on in column three, lines one through four, to say by switching to an acetate buffer. So you had these tartrate examples and you switched to an acetate buffer. That has to mean that the tartrate formulations didn't have what this patent is calling an acetate buffer. And that's because the patent is not referring to. Looking at that part of the specification, it says by switching to an acetate buffer, then it goes on, it creates a more stable product. You have less unwanted degrades. So this is, this makes it attractive as a commercial product. That's not to say that, it says you can switch if you want, or you can add more if you want. But I'm still left with a claim that doesn't require that something additional be added. And the fact that something can be added, that you can add additional buffer, doesn't mean you have to. But if you look at the language, it says by switching to an acetate buffer, and the claim is to an acetate buffer. That means the tartrate formulation didn't have an acetate buffer. You went from that formulation and switched to one that does have an acetate buffer as claimed here. And then you look at all of the examples. And the examples nowhere refer to the tartrate examples as a mixed buffer. They're talking about what you put in. You put in the active ingredient and tartrate, or the active ingredient and acetate. And the specification tells us at column 8, lines 65 through 67, it was surprisingly found that formulations 1, 5, 7, and 8, these are the ones that add acetate, were significantly more stable and showed significantly less of unwanted degradates than the other formulations. These are the ones with tartrate. This is the only data in the entire patent. These are what they're referring to as the unexpected results that were the basis for the examiner allowing this claim in the first place. So you can't look at the entirety of this specification and say that what they were talking about was caspofungin diacetate that dissociates in the presence of a tartrate buffer to create this acetate buffer. To understand the argument, if I look at the prosecution history, where do I see a clear and unmistakable disclaimer? If you look at pages 3886 and 3889, it's the interview summary and the reasons for allowance. The examiner tells us, you've shown unexpected results and those unexpected results are in the specification. And so clearly, they showed unexpected results for one thing compared to another thing and there's only two things in the specification. The caspofungin diacetate with an added acetate buffer and caspofungin diacetate with an added tartrate buffer. How is that a clear and unmistakable disclaimer of the acetate that's already in the compound? You have to show unexpected results compared to something. You can't look at this and say, there were unexpected results but we didn't compare everything. You get everything in your specification. The examiner was clearly looking at this saying, you've shown unexpected results for one thing compared to another and the only two things in the spec are tartrate and acetate and that's consistent with what the patentee tells us at column 8, lines 65 through 67. The patentee says in the specification, it was surprising, it was unexpected. These are the unexpected results the examiner is looking at that the one with added tartrate showed stability and the one with added acetate, I'm sorry, the one with added acetate showed stability and the one with added tartrate didn't. Why is there more stability? Well, if you look at what the specification says and I'll go back to column 2, lines 23 through 30 again, they're not talking about some stability. The specification says, the formulations of the invention, language that would suggest a disclaimer, provides enhanced chemical stability to the formulations, to the pharmaceutical compositions. They're not talking about some stability relative to the active ingredient itself. It says these have enhanced stability relative to some other composition and then they tell us two lines later that that other composition is the tartrate buffered formulation. And the reason we end up in the situation we're in here is because during the prosecution of this patent, during the writing of this patent, nobody paid any attention to the fact that when you take cascofunction diacetate and mix it with tartrate, you get this dissociation and salt exchange. That's not what this patent contemplated. You can read this patent backwards, forwards, you can read the entirety of the prosecution. There is not one word in there that suggests the tartrate example contains a mixed buffer. This patent was looked at like a recipe and they said this is the active ingredient we put in, this is the buffer, and they said we want the added acetate buffer, not the other buffers, tartrate, lactate, phosphate. And so they merrily went on their way. It wasn't until they had to encompass a product that used a different buffer, a succinate buffer, that this theory comes to light, that there is this salt exchange, and oh yes, the tartrate buffered examples are covered. The rule is pretty strong against reading process limitations into a product claim. What case is the strongest case for you, do you think, to warrant an exception here? Well, this is a case where, like one of our own Federal Circuit opinions. If I had to pick one, it would be the one that's cited in reply, and it starts with an F. Edwards Life Sciences, cited on page 8 of our reply brief. But this is a case where, regardless of the standard, no matter how exacting you say it is, when you look at the entirety of the specification, the repeated statements that we switch to an acetate buffer, that the tartrate buffer doesn't give you enhanced stability, that the acetate examples showed enhanced stability, and then the basis of the allowance being a comparison based on the data in the spec, which only compares those two things, you can't read this as encompassing the tartrate examples of the patent. And so we would contend it's not reading in a process limitation, but it's giving the claim its due scope in view of the statements in the specification and the prosecution history. I see a minimum of my reply time. Thank you. Mr. Nimrod. May it please the Court, Ray Nimrod for Merck. Your Honor, Judge Tend, the Edwards case actually is not a process limitation case. We asked a question about what case would he refer you to for the process limitation. We referred, Your Honor, to the Sanofi-Aventis case where the court stated that the specification never asserts that HPLC is required to obtain the optically pure explantin. And for that reason, there was no process limitation read in. In comparison to Chimay, which they cite in their reply brief, it says, the court reached this construction by reference to the prosecution history where Rodia distinguished the prior art by emphasizing its claim that silica particulates could be obtained only by applying liquid pressure nozzle sprayers to the pulverized slurry. So the standard that the court applied was whether or not there was a statement saying the only way you could obtain what was required by the claim, the applicant said very explicitly, the only way you're going to get this is by doing a certain process. And that is not found here at all. Can you point, except for the claim language that refers to acetate buffer, can you point to anything in the intrinsic record that suggests that this in situ disassociation is what was covered by this claim? Yes, Your Honor. That would be the prosecution history, for example, if we go there. And I'd like to also go through the reasons for allowance. Anything in the spec before we get to the prosecution history?  In the salt exchange that we were talking about, all the experts agreed that occurred. So when a person skilled in the art is reading these examples, they understand that when you put a tartrate buffer in to a system that has an acetate salt, that the exchange takes place, and therefore all these examples have a mixed system unless they're pure acetate. So you read the specification and you say that anything that just has a tartrate buffer is also infringing, that that's also covered by the claim? Your Honor, it would be if there's an acetate salt being used, yes. And that was not disputed at all. And that's the way one skilled in the art would read all of these. Disparagement might be too common, but all of these views about how tartrate buffers don't work, and we're switching in acetate buffers for tartrate buffers to accomplish this. Your Honor, it doesn't say that tartrate buffers won't work. In fact, what it says in Column 2 is that when you added the tartrate buffer, the composition became relatively stable. And then when you go to Column 3, it says that, in fact, when you add more acetate, it becomes even better and suitable for a commercial product. Well, wait a second. Add more acetate. I mean, it said switching from a tartrate buffer to an acetate buffer. And when it talked about the tartrate buffer, it talked about, yes, while relatively stable resulted in a generation of degradates at a relatively high rate. And then, you know, as your opposing counsel pointed out, towards the end of the written description, after going through all the examples, the ones with the tartrate buffer and the ones using the acetate buffer, the windup of the spec is it was surprisingly found that Formulations 1, 5, 7, and 8, the acetate buffer ones, were significantly more stable and showed significantly less of the unwanted degradates than the other formulations, i.e. the tartrate formulations. To me, the comparison there is pretty clear that what these people are happy about and what these people have discovered is that the use of an acetate buffer, surprisingly, they don't know why and they don't know how, is producing a composition that is way more stable compared to other uses of other buffers as well as something that gets away from all the unwanted degradates. I could explain this from the viewpoint of people skilled in the art. What this is teaching is that when you have no acetate buffer, it was highly unstable. Then we use an acetate salt and you had a tartrate buffer, it improved for some reason. This is the development. None of this is prior art in terms of using a tartrate buffer. What it's showing is how the inventors came about discovering that acetate buffer was the key, however it got there. They found no buffer at all, highly unstable. They put in an acetate salt and a tartrate buffer, and all the experts agreed that means there's going to be a mixed buffer system. There was no dispute on that at trial at all. Everybody agreed that would happen, and it got better for some reason. In their development process, what they did, and this is found in the prosecution history. It got better, and then what did they claim? Was it good enough to be what you say they claimed? The claim says there has to be an acetate buffer. There's no limitation on degradates. Going back to Column 2, which is titled Detailed Description of the Invention, the formulations of the invention provide enhanced chemical stability to the pharmaceutical compositions. Then it says prior formulations employing a tartrate buffer contain pharmaceutically significant amounts of unwatered degradation. The use of an acetate buffer results in the generation of fewer degregates and a more stable formulation. Extended pharmaceutical shelf life offers significant economic advantages. They are talking about the invention. What in there can I read to say that the tartrate buffers are included in this invention? Not the tartrate buffers. The question is whether acetate buffers are included. Right, but the way the spec talks, it talks about prior formulations using a tartrate buffer had problems. The invention's formulations using an acetate buffer has advantages. Well, the way it actually goes, Your Honors, it says that the formulations were highly unstable. They added a tartrate buffer, and it was improved. And then they added more acetate by going to one which had an acetate salt. I wish you wouldn't call it more acetate. They added an acetate buffer in addition to having the acetate salt. And they also did other tests that are shown in the prosecution history of A3812 where they say that when they used a tartrate buffer, it improved stability relative to the new drug. And then they ran a test. So this is how the whole discovery took place. The inventors put in the tartrate buffer with the acetate salt, and they saw an improvement. So what did they do? As shown in A3812, they went from this relatively stable formulation with 50 millimoles of tartrate buffer and went to 100 millimoles, thinking, well, we'll have more tartrate. It'll be better. It actually got worse. And from that, they concluded that the acetate buffer was the key. In other words, you had this mixed system. They assumed it was the tartrate that was doing the work, but it wasn't. So then they added acetate buffer after that. And they found that, yes, it is the acetate buffer that is, in fact, giving us the stability. And the spec itself, you know, which represents what the inventors knew at the time of this invention and the time they filed their claims, says in the wind-up that it was surprisingly found that when you use an acetate buffer, it's significantly more stable than when you use tartrate buffer. So the idea is, especially when it refers to the compositions using tartrate buffers as prior formulations, it's really leaning towards telling us that the invention is, surprise, using acetate buffer is really exceptional. What it's doing is telling the person what is, in fact, giving them improved stability. Prior formulations here, there's no dispute, that's not prior art. This is just the inventor's development story. When they went along, they used the tartrate buffer and discovered there was some improvement. And then they went on with their research to find out that that system that had acetate buffer in it, the reason it was getting better was because of the acetate buffer. And if we read the reasons for allowance, I think it's very important here to understand what the examiner was saying. But you're saying they claim that the tartrate buffer is included in the scope of this claim. We have a comprising claim, Your Honor. So we're not saying an acetate buffer is, in fact, a tartrate buffer. In fact, they don't use tartrate in their product. There's a disavowal, which they didn't even raise below. It may apply to a tartrate buffer, but that's not even disavowed because the claim is directed to having three components, one of which is an acetate buffer. The only question for infringement is whether or not you have an acetate buffer. You can have another ingredient because it's a comprising claim. It's a composition claim that requires three elements, and it is a comprising claim. So if you take a tartrate buffer and mix it with a diacetate salt, and there is this salt exchange, and all the experts agreed, you'll have some acetate buffer and some tartrate buffer. We are not saying the tartrate buffer is what is called for by the claim. We're saying the acetate buffer meets element C, and whether or not you have additional buffer doesn't matter because it's a comprising claim. And that's what was going on with those tartrate examples. They mixed them. They got better stability, and they had two buffers in there. So they ran tests, and the tests showed that the tartrate was not the thing that was doing it. It was making it worse. So the claim is a broad claim to three elements, one of which is an acetate buffer, and we are not alleging, we have never alleged, that the tartrate buffer is an acetate buffer. We had to prove, and we did prove, that in fact there was an acetate buffer present in their product. If they had another buffer present as well, that wouldn't matter because it's a comprising claim. I cut you off just before your time runs out. Are you going to tell us about the prosecution history? I was just going to read the reasons for allowance, Your Honor. In the prosecution history, the applicants submitted a paper explaining their research, and at A3812 they explained that when they added this tartrate to this diacetate salt, they got improved stability relative to the drug. And they go on and describe this experiment where they added more of the tartrate buffer, and they concluded, in addition, increase in tartrate concentration to 100 millimoles enhanced the instability. And they go on and then add a separate acetate buffer and get things even better. So from that they concluded the acetate buffer is the key. You can have other things, but the claim says as long as you have an acetate buffer, you are infringing. And in the reasons for allowance, here's what the examiner said. He didn't say, I understand that the tartrate examples are disclaimed, that they're not covered. He said, Remington's teaches that acetate is a member of, excuse me, this is at A3889, is a member of a genus of buffers that are suitable for dissolving compounds for subsequent lyophilization. However, applicant has demonstrated that the species of the genus are not equivalent. The specification shows that tartrate buffer, the tartrate buffer, not the examples, not everything in that example, the tartrate buffer unexpectedly destabilizes the claimed cyclic peptide, while acetate has the unforeseen stabilizing effect on the formulation. What the examiner understood based on the experiments that had been shown to him was that the tartrate buffer itself was destabilizing. The acetate buffer was the key. If you had acetate buffer, you were going to get the positive effect, and that is what the claim in fact covers. What about A3883-84? This is a response to, or maybe this is your notice of appeal to the board, where you disputed the obviousness type double patenting rejection by pointing out that the whole course of the prosecution history was the examiner saying it would be obvious to use an acetate buffer to buffer these kinds of compositions. And then your side kept pushing back and then saying, you know, how do you choose the right buffer? And there's more going on in using the acetate buffer here than controlling the pH of the solution. And then at the bottom of A3883, thus one skill in the art would not expect acetate acid to be an effective buffer for the formulation of the invention, period. The use of an acetate buffer is clearly doing more than merely buffering the formulation. It would not be obvious to one of ordinary skill in the art, right? So again, this seems to underscore that your push that the use of an acetate buffer in creating these compositions is what the invention is and why it's not obvious to do it, because number one, it has a pH that's far away from the pH of the caspofungin diacetate, but also it has all these surprising results. Well, Your Honor, when you take caspofungin diacetate and mix it with a tartrate buffer, or in their case a sussinate buffer, let's focus on that, you are using an acetate buffer and you have acetic acid. The science shows that, I think we should understand there's the three steps of making this product. First, you make a bulk solution that's prior to lipolyzation, and the patent talks about different ways of getting an acetate buffer in there. There's some that are formed in situ, for example. You can add sodium acetate, which is not an acetate buffer, but when you put it in a bulk solution, when you put in the API and other ingredients, it forms an acetate buffer. So it's not like you have to get the acetate buffer to use it, that you have to add in something that says on the label acetate buffer. You can put in, for example, sodium acetate. That's not an acetate buffer, it forms in situ. So you're forming a bulk solution, and you want to get an acetate buffer in there to get the benefits of the acetate buffer when you lipolyze. You want to use an acetate buffer. So the bulk solution is you put in the caspofungin diacetate, for example, a sussinate, and the acetate buffer forms in situ. No dispute, there's acetic acid in there, and there's acetate anion. There's an acetate buffer present in that bulk solution. Then, and this is critical, you lipolyze. The key thing about lipolyzing is you have to have an acetate buffer present. And when you do that salt exchange, you do have an acetate buffer present. You are using an acetate buffer, and you're getting the benefit of the invention. That's all that is required. So the bulk solution says get me an acetate buffer in there somehow. Whether it's with sodium acetate, acetic acid, as long as I have that acetate buffer, I use that, and then I lipolyze, I get this, for some reason, no one knows why, you get this great stability upon storage. And storage is always done in a lipolyzed state. So you are using an acetate buffer when you have this salt exchange take place. And all the experts agreed on that, that that bulk solution has an acetate buffer in it, and it's going to give you the benefits if you're using it at that point. The other side said in the reply brief that it says to formulate in the presence of an acetate buffer. And we said, well, lipolyzation, that's part of the formulation. You're using the acetate buffer for lipolyzation. They said, well, that's not part of the formulation. But, in fact, the part of the specification they rely on in that says, and it's the part your Honor's been talking about, the pharmaceutically acceptable salts are of are significantly more stable on storage. This is in column 2, lines 54 to 56. They're more stable on storage when formulated in the presence of an acetate buffer. That, in fact, is the lipolyzed formulation. It's not a solution. And this patent, every single time it's stored, it's stored as a lipolyzed cake. You can't store this as a solution. So you make that bulk solution. And the critical thing is to have an acetate buffer present. Have some acetic acid and acetate anion. And if you have that and then you do your lipolyzation, you're going to get the benefits of the invention. So in every instance we've been talking about, no matter how the acetate buffer is formed, it ends up in the bulk solution. And it ends up being used in the bulk solution. And then it gets lipolyzed and gives you the benefits. It doesn't matter to the bulk solution how the acetate buffer got there. And I'd like to give one example that we mentioned in our brief, and they're expert agreed with, which was if I take caspofungin tartrate and I add an acetate buffer, I put it in bulk solution before lipolyzation, there will be an acetate buffer present in there, acetic acid and acetate anions. They'll be present, then you lipolyze, you get the benefit of the invention. If I do the exact same thing, but instead I put a caspofungin diacetate salt in and put in a tartrate buffer, you put it in bulk solution, and they do this exchange. You get the identical bulk solution in both instances, A and B. In one instance you added the buffer, in one you did not add the buffer. It came in and formed in the bulk solution. In both instances you lipolyze, you'll be using an acetate buffer, you get the benefit of the invention. Everybody agrees that it takes place. In fact, their expert, Dr. Myrtle, agreed when I cross-examined him, saying, yes, I agree that that in fact would take place. And that's at A3479-82. That if I start with the salt of the tartrate versus the salt of the acetate, I get the exchange, they're identical. It's the same bulk solution, yet according to Zelle's interpretation, one would infringe and one would not infringe. The lipolyzed cake would be exactly the same. The reconstituted solution would all be the same. You're using an acetate buffer, no matter how you form it, as long as it gets in the bulk solution. And this is being read by persons skilled in the art. They're saying, well, there's no talk about a mixed buffer. A person skilled in the art reading this knows that this salt exchange is not some novel thing. As soon as that acetate salt goes in and a tartrate buffer goes in, they know that in fact there's an exchange, you're going to have a mixed buffer system. And then the inventor said, boy, I guess it's probably the tartrate. They found that it wasn't the tartrate. It was the acetate. And that's what the claim goes to. The claim says you just have to have an acetate buffer. It doesn't matter how you get there. There's no disclaimer saying that you have to do it via a certain process. It just says get it in the bulk solution. If you have an acetate buffer and it has an effect to provide the pH, then you are, in fact, infringing and can provide the claims. Thank you. I will be brief. I just want to make four quick points. In response to Judge Chen's earlier question about case, I was looking at a disclaimer case. That's why I cited Edwards. On pages three and four of our reply brief, we addressed the process issue and the non-precedential Sanofi case that they cite makes clear that there are situations where you can and situations where you can't read a process limitation in, if you want to call it that, based on the spec, the prosecution history, the entirety of the intrinsic record. The story that you just heard about this was the invention story and everybody knew it was a mixed buffer and everybody would have assumed it was the tartrate and a cite to JA 3812 of the prosecution history. None of that's in the intrinsic record. There isn't a statement anywhere in the prosecution history. He was asked directly. Merck doesn't have any statement to show a mixed buffer or to say that the tartrate example was understood to be a mixed buffer in the written documents. There is none. What the patent talks about and the prosecution history talks about is the active ingredient caspofungin diacetate and what you add to it as a buffer. Now, whether you make that buffer in situ by mixing two things, like sodium hydroxide and acetic acid, as the specification talks about, you're still adding that to the active ingredient in every example in the specification. But that's not adding an acetate buffer at that point. It's adding other compounds that create an acetate buffer. It's making two things, adding two chemicals to make an acetate buffer and then adding that. Can you include two different chemicals that will result in an acetate buffer? You can as long as it doesn't come from dissociation of the active ingredient caspofungin diacetate because if it comes from there, you recapture the tartrate buffered examples that were relinquished. And I would submit that on the entirety of the intrinsic record, you cannot read the specification of this patent and the prosecution history and the examiner's statement that we're giving up all buffers other than acetate. Is it your argument that the acetate buffer cannot be formed in situ? No. It's our argument that the acetate buffer cannot be formed from the dissociation of the active ingredient caspofungin diacetate mixed with a non-acetate buffer like tartrate or succinate because if that is the case, you cover the very tartrate examples that the intrinsic record makes clear or disclaim. The examiner said here, there's a genus of buffers, and he was very clear on 3889 of the Joint Appendix. I'm not giving you the entire genus. You get acetate. You don't get tartrate, you don't get phosphate, you don't get citrate. But the key thing is the specification shows that tartrate buffer unexpectedly destabilizes the claimed peptide while acetate has an unforeseen stabilizing effect. The only two things in the specification are formulations that have the active ingredient caspofungin diacetate mixed with tartrate or caspofungin diacetate mixed with additional acetate. And the examiner says you get one, not the other. Is your argument that the only way you can have acetate buffer in the final compound is that if you add it separately? You get a bottle that says acetate buffer on it, and you add it to the formula? No. So there's other ways of doing that. Yes, the specification tells you you can mix sodium hydroxide and acetic acid or sodium acetate and I forget what the other one is. It's a column 3 second paragraph. I guess another way of asking it is there can be multiple different ways where an acetate buffer appears in the final composition. But you're saying that this claim requires at least one particular way of it getting there, and that would be by using an acetate buffer as an ingredient. Yes. The prosecution history and the specification make clear you could mix two things to make an acetate buffer and then drop your active ingredient in it. You could take your active ingredient and add acetate buffer to it. What you can't do is take the active ingredient, caspofungin diacetate, mix it with tartrate or mix it with succinate and then say, oh, that dissociates and forms an acetate buffer because that would encompass the very compositions, the tartrate compositions that they said aren't covered. And I would like to ask one issue, one additional point, and it's the issue of reverse versus remand. There was a statement in their brief that you would need to send this back to the district court to assess whether there's infringement should the court change the claim construction. There is absolutely no dispute about our product. Zellia takes caspofungin diacetate, they mix it with a succinate, succinic acid. That's what goes into it. There's no separate acetate. There's no chemicals that mix to form acetate. Everybody agrees what the product is. So there's no need for a remand, and that's important because this patent expires in March of 2017. Thank you. Thank you.